UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

        Plaintiff,

v.

DARRICK DERNARD BELL, et al.,

        Defendants.
_____/

Case No. 17-cr-20183
Hon. Mark A. Goldsmith

**OPINION & ORDER
(1) DENYING DEFENDANT NERO'S MOTION TO SEVER TRIALS (Dkt. 211); (2) GRANTING IN PART AND DENYING IN PART PRUITT'S MOTION TO SEVER (Dkt. 234); AND (3) DENYING RANDOL'S MOTION FOR RELIEF FROM PREJUDICIAL JOINDER/MISJOINDER FOR SEVERANCE AND FOR SEPARATE TRIAL (Dkt. 277)**

This criminal case involves multiple defendants, all of whom have been charged with involvement in a complex drug and human trafficking conspiracy and related crimes. Defendants Harold Nero, Terry Pruitt, and Anthony Randol have filed motions to sever (Dkts. 211, 234, 277, respectively), arguing that they should each be tried separately from their eight co-defendants. The Government has filed responses in opposition (Dkts. 220, 259, 281, respectively), and Pruitt filed a reply brief (Dkt. 276). For the reasons discussed below, the Court denies Nero's and Randol's motions to sever and grants in part and denies in part Pruitt's motion to sever.[1]

### I. BACKGROUND

A grand jury indicted Nero on nine charges, Pruitt on seven charges, and Randol on three charges stemming from their alleged role in a large human trafficking and drug distribution

---

[1] Because oral argument will not aid the Court's decisional process, these three motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

1

conspiracy at the Victory Inn Hotel on Michigan Avenue in Detroit, Michigan. See Superseding Indictment (Dkt. 98). Each of these defendants is charged with every co-defendant in at least one count.

### A. The Initial Investigation and Surveillance

The federal investigation began in September 2016, when an emergency room human-trafficking and heroin-overdose victim ("Victim 1") told federal agents from the Department of Homeland Security's Homeland Security Investigations ("HSI") about a conspiracy that was forcing women into prostitution and selling drugs at the Victory Inn. Victim 1 stated that she had swallowed drugs to avoid detection on the orders of a pimp named "Tone," an alias used by co-defendant Darrick Bell. Bell is a convicted murderer and drug dealer. Nero allegedly worked as an enforcer and drug distributor for Bell.

In subsequent interviews, Victim 1 confirmed that Bell is the leader of the conspiracy, that he uses drugs to coerce the human-trafficking victims, and that she was terrified of his physical assaults. Victim 1 said that the Victory Inn staff was part of the conspiracy and would direct sex dates to certain rooms.

Another human-trafficking victim ("Victim 2") described an extensive drug and human-trafficking operation headed by Bell, where she and other women had been held against their will for several weeks. Victim 2 stated that the conspiracy forced women to commit sex acts for money in exchange for a room at the Victory Inn and drugs to support their addictions. Victim 2 said that the Victory Inn staff was complicit in the criminal activity and that they only used a handful of rooms at the hotel for legitimate customers.

On November 3, 2016, Detroit Police and Detroit EMS responded to a female drug overdose victim ("Victim 3") in room 118 at the Victory Inn. While assessing Victim 3, Detroit

2

Police talked to Pruitt at the door of room 118. On a Detroit Police bodycam video, Pruitt casually discusses the fact that he can procure prostitutes for customers.

On November 4, 2016, Detroit Police spoke to a female victim ("Victim 4") at a gas station near the Victory Inn. Victim 4 stated that she was a prostitute who lived at the Victory Inn, and that Bell frequently delivered drugs to the hotel. A few days later, HSI installed a nearby pole camera to conduct surveillance on the Victory Inn. On November 23, 2016, a confidential informant told police that multiple drug dealers were working out of the Victory Inn.

In early December, HSI and Detroit Police began conducting surveillance at the Victory Inn. They observed dozens of apparent hand-to-hand drug deals and commercial sex dates in several different rooms. The police performed traffic stops on several customers who left after short stays. One customer admitted that she had just purchased $30 worth of crack cocaine from the Victory Inn, that she had been buying crack cocaine for the past several months from various individuals at the Victory Inn, and that "lots" of "girls" work as prostitutes to support their drug habits. Another customer, who had purchased crack cocaine at the Victory Inn, said that he had been buying crack cocaine for the past three months at the hotel, and that any prostitute on Michigan Avenue would tell you to get drugs "at the Victory Inn."

On December 26, 2016, Dearborn Police responded to a drug-overdose call for a woman at the Best Value Inn hotel in Dearborn, Michigan, which is a few blocks from the Victory Inn. The female victim ("Victim 7") died at the scene. Victim 7's boyfriend stated that she had ingested drugs that they had purchased that day at the Victory Inn.

On December 29, 2016, another confidential informant told police that multiple people are selling drugs and "pimping" girls at the Victory Inn.

**B. The January 2017 Search Warrant**

On January 12, 2017 at 6:00 a.m., HSI and local police executed a search warrant for twenty-five rooms at the Victory Inn. During the execution of the warrant, agents rescued fourteen lethargic female trafficking victims who were suffering from drug withdrawal in disheveled rooms. They arrested Randol after he tossed thirty-five grams of crack cocaine from a room window. Agents also recovered one loaded firearm, narcotics, paraphernalia, and dozens of cell phones. Most of the hotel rooms contained extensive evidence of recent drug use (e.g., used needles, used baggies, etc.). Agents also seized the Victory Inn's encrypted video surveillance data from the hotel's cameras, and records including thousands of handwritten room receipts.

After rescuing the human-trafficking victims from the Victory Inn, agents were able to interview some of them who confirmed that Bell and the other co-defendants controlled, directed, and participated in the drug distribution and commercial sex at the Victory Inn. More than one victim stated that Nero abused them, would hit the girls to keep them "in check," and even guarded them like prisoners while they walked to prostitute themselves on Michigan Avenue.

**C. The Evidence from the Victory Inn**

Review of the pole camera video and pictures shows a high volume of apparent hand-to-hand drug and commercial sex transactions from almost every Victory Inn room across a period of two months.

Agents also recovered approximately 14,300 hours of encrypted video—the equivalent of more than one year and seven months—from the Victory Inn's thirteen surveillance cameras. Nero is visible participating in drug-related activities and can be seen walking past an overdosing woman. Subsequent agent review of video from just two of the thirteen cameras revealed approximately 567 apparent drug and human-trafficking interactions.

Three clips from January 2, 2016 and January 3, 2016, from yet another internal hallway camera, show widespread drug-dealing and human-trafficking victims. In the clips, Nero directs drug traffic, drug customers crowd the hallway, hand-to-hand deals take place, and a woman appears to overdose.

**D. Nero**

According to Nero, while on parole and living at the Victory Inn, he sometimes had difficulty paying for his room. Nero Mot. at 4. He did odd jobs around the hotel, such as cleaning up the outside and similar custodial jobs. Id. Nero admits that he was a heroin addict and occasionally purchased controlled substances from his co-defendants, but he says that it was only for personal use. Id. He asserts that he was involved with many of the women at the Victory Inn, but only because he was also a resident there, and not as part of a conspiracy. Id. at 4-5. Nero maintains that he was merely present at the Victory Inn, admittedly using drugs, but that he was never part of a criminal conspiracy. Id. at 5.

**E. Pruitt**

Pruitt admits that he was a drug dealer who operated from a room at the Victory Inn, but says that he operated in isolation and in competition with his co-defendants. Pruitt Mot. at 4. He says he was not involved with sex trafficking, although he was aware that his co-defendants were engaging in such activities. Id. He says that to prove his case at trial he will necessarily have to point the finger at his co-defendants. Id.

**F. Randol**

According to Randol, he was residing at the Victory Inn when it was taken over by individuals involved in human trafficking and related drug distribution. Randol Mot. at 5. He

says that there are two types of charges in this case: those related to human trafficking and those related to drug trafficking; he says his charges fall into the drug-trafficking category only. Id.

## II. STANDARDS OF DECISION

Joinder of multiple defendants in a single indictment is permitted under Federal Rule of Criminal Procedure 8(b) if those defendants are "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Because this rule is designed to promote economy, efficiency, and convenience, as well as avoid a "multiplicity of trials" and the "scandal and inequity of inconsistent verdicts," Zafiro v. United States, 506 U.S. 534, 537, 540 (1993), a district court should liberally construe Rule 8 in favor of initial joinder, United States v. Moreno, 933 F.2d 362, 370 (6th Cir. 1991) (recognizing general rule in conspiracy cases that "persons jointly indicted should be tried together"). This is particularly true when it comes to conspiracy cases where "the offenses charges may be established against all of the defendants by the same evidence and which result from the same series of acts." Id.; see also United States v. Bates, 552 F.3d 472, 478 (6th Cir. 2009) (recognizing the presumption in favor of joint conspiracy trials in the federal courts); United States v. Norwood, 50 F. Supp. 3d 810, 822-823 (E.D. Mich. 2014) (same). Only Randol argues that he was improperly joined under Rule 8(b).

Nero, Pruitt, and Randol contend that severance is warranted under Federal Rule of Criminal Procedure 14(a), which provides, in pertinent part, that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials . . . ." Unlike a challenge to joinder under Rule 8, which is limited to the factual allegations in the indictment, a pretrial motion for severance under Rule 14 focuses on the evidence that is likely to be presented at trial. United States v. Chavis, 296 F.3d

450, 456-458 (6th Cir. 2002) (noting that "challenges under Rule 14 must be renewed at the close of the evidence (to see if the joinder prejudiced the defendant at trial)").

The standard for severance under Rule 14 is stringent and falls within the district court's sound discretion; severance is only required if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. Although the determination of prejudice will inevitably vary depending on the facts of the case, id., the defendant must demonstrate "compelling, specific, and actual prejudice," Thomas v. United States, 849 F.3d 669, 675 (6th Cir. 2017); see also United States v. Fields, 763 F.3d 443, 457 (6th Cir. 2014) (defendant must demonstrate "specific substantial, undue, or compelling prejudice" (citation and quotation marks omitted)); United States v. Martinez, 432 F. App'x 526, 529 (6th Cir. 2011) (finding that a risk of "simple prejudice" is insufficient to warrant separate trials of co-defendants).

Nevertheless, even where there is a high risk of prejudice, a court may use "'less drastic measures'" to alleviate any risk of prejudice, including limiting instructions. United States v. Driver, 535 F.3d 424, 427 (6th Cir. 2008) (quoting Zafiro, 506 U.S. at 534); accord United States v. Al-Din, 631 F. App'x 313, 327 (6th Cir. 2015). Thus, "if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants," a motion for severance should be denied. United States v. Causey, 834 F.2d 1277, 1287 (6th Cir. 1987).

### III. DISCUSSION

Defendants, to one degree or another, all advance a similar argument—that they were merely at the Victory Inn when it was raided and, therefore, appear guilty by association. They argue that because they were not part of any of the conspiracies, they will necessarily be presenting antagonistic defenses to the other defendants. They are concerned that the evidence presented

7

against the other defendants may have a "spillover effect" causing jury confusion. See Nero Mot. at 8-9; Pruitt Mot. at 2; Randol Mot. at 4-5. Pruitt additionally argues that any co-defendant statements that potentially incriminate him pose a Sixth Amendment Confrontation Clause problem. Pruitt Mot. at 6 (citing United States v. Bruton, 391 U.S. 123 (1968)). The Court will take the arguments in turn.

### A. Jury Confusion

Defendants all concede that there were criminal enterprises operating from the Victory Inn. Pruitt goes so far as to concede that he was selling illegal drugs at the Victory Inn. But contrary to the Government's position, Pruitt says he was operating in competition to his co-defendants. Defendants characterize the Victory Inn as the equivalent of a criminal office building with a separate criminal endeavor operating behind each door. Defendants assert that this separation will raise antagonistic defenses at trial and that there is potential for evidence to spill over from one defendant to another causing jury confusion. The Government disagrees. It says that the Victory Inn was a unified and wholly-owned criminal enterprise with Defendants Bell and Janette Gaggo Tawfik at the top and other Defendants, such as Nero, Pruitt, and Randol, serving in the middle management roles. Although these case themes may be useful to advance the parties' respective positions to the jury, the themes do not raise issues of jury confusion such that severance is warranted.

As an initial matter, Randol moves for severance under Rule 8(b) arguing that he was improperly joined. While Rule 8 "should be construed in favor of joinder," failure to meet the requirements of Rule 8 constitutes "misjoinder as a matter of law." United States v. Hatcher, 680 F.2d 438, 440 (6th Cir. 1982)). Whether joinder is proper under Rule 8(a) is determined by the allegations on the face of the indictment. United States v. Frost, 125 F.3d 346, 389 (6th Cir. 1997).

8

Only if joinder is proper under Rule 8(b), can a court consider prejudice under Rule 14(a). Hatcher, 680 F.2d at 440.

There is no question that Randol was properly joined under Rule 8(b). The grand jury charged Randol with being part of "a drug trafficking organization that distributed quantities of cocaine base, and heroin," and found that he "acted in various capacities . . . including . . . the actual distribution and protection of illegal narcotics." Superseding Indictment at PageID.310. To further the conspiracy, the Government alleges that Defendants, including Randol, "held meetings at the Victory Inn to coordinate" their common drug activities, including distributing the drugs to coerce sex trafficking victims "into committing commercial sex acts at the Victory Inn and other locations." Id. at PageID.310-311. These allegations in the indictment are sufficient to establish that Defendants participated in the "same series of acts or transactions" to constitute the charged offenses. Fed. R. Crim. P. 8(b). Accordingly, the Court denies Randol's motion to sever under Rule 8(b).

Nero, Pruitt, and Randol move for severance under Rule 14(a) arguing that they will suffer prejudice if their respective trials are not severed. With respect to prejudice under Rule 14(a), there is a well-established presumption that juries are capable of sorting through the evidence between charges and defendants, as well as considering the innocence or guilt of multiple defendants separately. See Driver, 535 F.3d at 427 (quoting Causey, 834 F.2d at 1288); see also United States v. Caver, 470 F.3d 220, 238 (6th Cir. 2006) ("[T]he risk of prejudice to defendants in a joint trial is presumably low, because 'juries are presumed capable of sorting evidence and considering separately each count and each defendant.'" (quoting United States v. Welch, 97 F.3d 142, 147 (6th Cir. 1996))). If a jury can adequately "'compartmentalize the evidence as it relates

to the appropriate defendants,'" then a motion for severance should be denied. Driver, 535 F.3d at 427 (quoting Causey, 834 F.2d at 1287).

Defendants argue that, because they are innocent of being part of a conspiracy, they will be presenting antagonistic defenses by pointing to the guilt of their co-defendants. "Antagonistic defenses arise when one person's claim of innocence is predicated solely on the guilt of a co-defendant." United States v. Harris, 9 F.3d 493, 501 (6th Cir. 1993). The standard for severing based on possibly antagonistic defenses is very high, and it requires "defendants to show that an antagonistic defense would present a conflict so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." United States v. Warner, 971 F.2d 1189, 1196 (6th Cir. 1992) (citations and quotation marks omitted). Defendants have not explained their respective defenses, let alone shown how their respective defenses would be so antagonistic to their co-defendants' defenses that the defenses would mislead or confuse the jury. "The mere fact that each defendant 'points the finger' at another is insufficient; the defendant must show that the antagonism [will likely] confuse[] the jury." United States v. Horton, 847 F.2d 313, 317 (6th Cir. 1988). Defendants' antagonistic positions do not warrant severance.

Defendants also raise concerns with potential "spillover" evidence. A so-called "spillover" or "guilt transference" effect occurs when the jury is "unable to relate the evidence to each defendant, hence imputing the guilt to one defendant for the activities of his co-defendants." United States v. Moore, 917 F.2d 215, 220-221 (6th Cir. 1990); United States v. Gallo, 763 F.2d 1504, 1526 (6th Cir. 1985) (explaining spillover effect may cause the jury to convict a defendant "not on the basis of evidence relating to [him] but by imputing to [him] guilt based on the activities of the other set of conspirators"). When it comes to joint trials, however, "there is always a danger

10

that the jury will convict on the basis of the cumulative evidence rather than on the basis of evidence relating to each defendant." Causey, 834 F.2d at 1288. Thus, "a defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him." Id. Instead, Defendants bear the high burden of demonstrating "specific substantial, undue, or compelling prejudice" that would arise from this spillover of evidence between defendants. Caver, 470 F.3d at 238; see also Thomas, 849 F.3d at 676 (same). This showing "is necessary because it maps those areas in which a jury is likely to be incapable of conducting this sorting function." Martinez, 432 F. App'x at 532 (citing Driver, 535 F.3d at 427; Caver, 470 F.3d at 238.). Absent a showing of such prejudice, "spill-over of evidence from one case to another does not require severance." Moore, 917 F.2d at 221; Gallo, 763 F.2d at 1526.

Severance under Rule 14 is premised on evidence likely to be presented at trial, Chavis, 296 F.3d at 457-458, but Defendants offer no more than conclusory assertions that the spillover evidence regarding unrelated charges would prejudice them. They fail to provide any explanation of what evidence the Government will likely offer regarding their co-defendants' charges. Nor do they explain beyond broad generalities how or why this evidence would result in compelling, specific, and actual prejudice. This sort of argument is not an adequate showing of substantial prejudice. See United States v. Neace, No. 07-20400, 2008 WL 1735373, at *3 (E.D. Mich. Apr. 14, 2008) (rejecting the defendant's argument that impermissible spillover warranted severance because he made only conclusory allegations of prejudice). And although Defendants maintain that they were not involved with the drug and sex-trafficking conspiracies, the mere fact that "inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, show substantial prejudice in the latter's trial." Gallo, 763 F.2d at 1525 (rejecting the defendant's argument for

11

severance based on the spillover of "highly inflammatory" evidence of "gruesome and brutal murders" charged against his co-defendants for which he was not charged).

Assuming there is a likelihood of spillover of evidence, Defendants similarly fail to explain how and why any of this evidence would "'mislead and confuse the jury in the absence of a separate trial.'" Fields, 763 F.3d at 458 (quoting United States v. Walls, 293 F.3d 959, 966 (6th Cir. 2002)). Again, Defendants provide nothing more than a conclusory assertion that a limiting instruction would be inadequate to cure any risk of prejudice. See Pruitt Mot. at 5-6. This Court believes that any potential confusion from spillover evidence will be prevented by carefully and adequately instructing the jury to consider the evidence against each Defendant separately, particularly regarding the conspiracy charges.

Because Nero, Pruitt, and Randol's arguments in favor of severance lack merit, the Court denies their respective motions to sever.

### B. Bruton violation

Pruitt also argues that his right to confront the witnesses against him will potentially be compromised if his trial is not severed, citing Bruton v. United States, 391 U.S. 123 (1968), and Crawford v. Washington, 541 U.S. 35 (2004). Pruitt's argument is undeveloped. He notes that the Government has not provided him with any co-defendant statements. Therefore, he cannot not provide examples of any specific statements, identify specific co-defendants who made statements, establish that any statements would be testimonial, establish whether they were made in furtherance of the conspiracy, or discuss whether they could be redacted to avoid a potential Bruton violation. Thus, the Court cannot find that a joint trial would violate Pruitt's right of confrontation at this time.

Because the Government has not provided Pruitt with any co-defendant statements, he seeks, in the alternative, that the Government be ordered to disclose any co-defendant statements that it intends to use in its case-in-chief under Rule 14(b). Pruitt Mot. at 7-8. Rule 14(b) provides that "[b]efore ruling on a defendant's motion to sever, the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statement that the government intends to use as evidence." Fed. R. Crim. P. 14(b). He argues that the disclosures would allow him to make specific objections to the testimony under Bruton. Id. The Government argues that Pruitt's argument is speculative and premature and that Rule 14(b) does not mandate pretrial disclosure of co-defendants' statements to a defendant. The Government further argues that if a non-testifying defendant's statement is introduced at trial, it can be redacted in such a way as to avoid any Confrontation Clause issues. The Court agrees with the Government that there are methods to avoid a Sixth Amendment problem, but it disagrees that the issue should wait for trial.

In Bruton, the Supreme Court held that a defendant's rights under the Confrontation Clause of the Sixth Amendment are violated when the confession of a non-testifying co-defendant that links the defendant to the charged crime is introduced at a joint trial. 391 U.S. at 135-137; see also Richardson v. Marsh, 481 U.S. 200 (1987). Bruton and its progeny, however, "'do not mandate pretrial disclosure of such statements to the defense.'" United States v. Murgio, 209 F. Supp. 3d 698, 725 (S.D.N.Y. 2016) (quoting United States v. Stein, 424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006)); accord Richardson, 481 U.S. at 209 (directing the government to produce a co-conspirator's statements with the defense during the pretrial stage would be "time consuming," "far from foolproof," and of "doubtful" feasibility).

Nevertheless, although a defendant has no absolute right to the statements his co-defendants made to authorities, see, e.g. United States v. Smith, 252 F. App'x 20, 25 (6th Cir.

2007) (finding that the defendant was not entitled to the statement of his co-defendants), vacated on other grounds by Townsend v. United States, 553 U.S. 1050 (2008), the district court has the discretion to order the Government to produce a co-defendant's statement before trial to the extent the co-defendant is not a prospective government witness, see, e.g., United States v. Rivera, 6 F.3d 431, 439 & n.7 (7th Cir. 1993) (concluding that "the question of whether the government must produce a codefendant's statement wisely is left to the sound discretion of the district judge," but recognizing that "the district court's discretion is limited by the Jencks Act"); accord United States v. Williams, 792 F. Supp. 1120, 1126 (S.D. Ind. 1992) ("[C]oconspirator statements may be discovered prior to trial only if the court orders them to be disclosed in the exercise of its discretion."). Given the circumstances of this case and the importance these statements may have in the preparation of Defendants' defenses, the Court grants Pruitt's motion with respect to disclosure of co-defendant statements. Unless the co-defendant is a prospective government witness as contemplated under the Jencks Act, the Government shall produce any statements of co-defendants that it intends to offer into evidence by November 6, 2019.

## IV. CONCLUSION

For the reasons stated above, the Court denies Nero's motion to sever trial (Dkt. 211), grants in part and denies in part Pruitt's motion to sever (Dkt. 234), and denies Randol's motion for relief from prejudicial joinder/misjoinder for severance and for separate trial (Dkt. 277). The motions are denied without prejudice as to motions to sever based on potential Bruton violations discovered subsequent to the Government's disclosure of any confession of a non-testifying co-defendant. The Government shall produce any statements of co-defendants that it intends to offer into evidence by November 6, 2019

SO ORDERED.

Dated: July 31, 2019      s/Mark A. Goldsmith
    Detroit, Michigan          MARK A. GOLDSMITH
                                          United States District Judge