UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v

    Case No. 17-cr-20183-4

    HON. MARK A. GOLDSMITH

D-4 TERRY PRUITT,

    Defendant.
_____/

## OPINION & ORDER
## DENYING DEFENDANT'S REQUEST FOR PRETRIAL RELEASE (Dkts. 427, 431)

This matter is before the Court on Defendant Terry Pruitt's notices of joinder in co-Defendants Darrick Bell's and Janette Gaggo Tafik's motions seeking pretrial release (Dkts. 427, 431). Pruitt contends that the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of his release, given the health risks presented by his continued incarceration during the COVID-19 pandemic. For the reasons that follow, Pruitt's requests are denied.

### I. BACKGROUND

A grand jury indicted Pruitt on seven charges stemming from his alleged role in an extensive human-trafficking and drug-distribution conspiracy at the Victory Inn hotel (the "Victory Inn") in Detroit, Michigan. Superseding Indictment (Dkt. 98). Pruitt initially consented to detention before the magistrate judge on April 25, 2017. See Consent Order (Dkt. 52).

Although neither of the parties proffered evidence in connection with Pruitt's present requests for release, the Court has previously evaluated evidence proffered by the Government in connection with co-Defendants Tawfik's and Nero's motions for pretrial release. See Op. & Order Denying Tawfik's Request for Pretrial Release at 2-7. (Dkt. 48); Op. & Order Denying Nero's Mot. for Revocation of Detention Order at 1-5 (Dkt. 183). This evidence included video clips

from the Victory Inn's surveillance system, screen shots from the Government's pole camera video, and victim and witness statements. The evidence concerns the operation of the alleged conspiracy generally, as well as Pruitt's role in the conspiracy. The Court's previous discussion of this evidence is included in relevant portion below.

**A. The Initial Investigation and Surveillance**

The federal investigation began in September 2016, when a human trafficking and heroin overdose victim ("Victim 1") told federal agents from Homeland Security Investigations ("HSI") about a conspiracy for the sale of women and drugs at the Victory Inn, orchestrated by Pruitt's co-Defendant Darrick Bell, a convicted murderer and drug dealer with several firearms convictions. Victim 1 stated that she had swallowed the drugs to avoid detection, as ordered by Bell, leading to her emergency room conversation with HSI agents.

In subsequent interviews, Victim 1 confirmed that Bell is the leader of the conspiracy, that he uses drugs to coerce the human-trafficking victims, and that she was terrified of his physical assaults. Victim 1 said that the Victory Inn staff was part of the conspiracy and would direct sex dates to certain rooms.

Another human trafficking victim ("Victim 2") described an extensive drug and human-trafficking operation headed by Bell, in which she and other women had been held against their will for several weeks. Victim 2 stated that the conspirators forced women to perform sex acts for money in exchange for a room at the Victory Inn and for drugs to support their addictions. Victim 2 said that the Victory Inn staff was complicit in the criminal activity, and that they only use a handful of rooms at the hotel for legitimate customers.

On November 3, 2016, Detroit Police and Detroit EMS responded to a female drug overdose victim ("Victim 3") in room 118 at the Victory Inn. While assessing Victim 3, Detroit

2

Police talked to Pruitt at the door of room 118. On a Detroit Police bodycam video, Pruitt casually discussed the fact that he could procure prostitutes for customers.

On November 4, 2016, Detroit police spoke to a female victim ("Victim 4") at a gas station near the Victory Inn. Victim 4 stated that she was a prostitute who lived at the Victory Inn and that Bell frequently delivered drugs to the hotel. A few days later, HSI installed a nearby pole camera to conduct surveillance on the Victory Inn.

In early December, Detroit Police began conducting surveillance at the Victory Inn along with HSI. They observed dozens of apparent hand-to-hand drug deals and commercial sex dates in several different rooms. The police performed traffic stops on several customers who left after short stays, three of whom attested to rampant drug and prostitution activity at the Victory Inn.

Another female victim ("Victim 6") was apprehended after attempting to flee the Victory Inn. She admitted that she was a frequent resident of the Victory Inn and to prostituting herself at the hotel. Victim 6 stated that there were as many as 20 female sex workers at the Victory Inn, and that the pimps worked for Bell. She also said that Bell delivered narcotics to the hotel daily and collected cash from the previous day's narcotics sales. Victim 6 further stated that Bell beat to death a female known as "Juicy" for failing to pay her drug debt, and police subsequently discovered that another victim was killed.

On December 26, 2016, Dearborn Police responded to a drug overdose call for a woman at the Best Value Inn hotel in Dearborn, Michigan, which is a few blocks from the Victory Inn. The female victim ("Victim 7") died at the scene. Victim 7's boyfriend stated that she had ingested drugs that they had purchased that day at the Victory Inn.

On December 29, 2016, another reliable confidential informant told police that multiple people were selling drugs and "pimping" women at the Victory Inn.

### B. The January 2017 Search Warrant

On January 12, 2017, at 6:00 a.m., HSI and local police executed a federal search warrant for twenty-five rooms at the Victory Inn. During the execution, agents rescued fourteen lethargic female human-trafficking victims who were suffering from drug withdrawal in disheveled rooms. They arrested co-Defendant Michael "Man" Randol after he tossed 35 grams of crack cocaine from a room window. Agents also recovered one loaded firearm, narcotics, narcotics paraphernalia, and dozens of cell phones. Most of the hotel rooms contained extensive evidence of recent drug use (e.g., used needles, used baggies, etc.). Agents also seized the Victory Inn's encrypted video surveillance data from the hotel's cameras, and records including thousands of handwritten room receipts.

After rescuing the human-trafficking victims from the Victory Inn, agents were able to interview some of them, who confirmed that Bell and the other co-Defendants controlled, directed, and participated in the drug distribution and prostitution schemes at the Victory Inn. Multiple victims stated that they were abused.

### C. The Evidence from the Victory Inn

Preliminary review of the pole camera video and pictures shows a massive volume of apparent hand-to-hand drug and commercial sex transactions from almost every Victory Inn room across a period of two months.

Agents also recovered approximately 14,300 hours of encrypted video from the Victory Inn's thirteen surveillance cameras. According to agents' review, the video shows hundreds of drug transactions; widespread prostitution; violence; and members of the conspiracy involved in these activities. Eleven video clips from this initial sample appear to reveal drug transactions,

forcible movement of human-trafficking victims, and drug use (including at least one apparent overdose that lasted a considerable amount of time yet went unaddressed).

## II. ANALYSIS

"When a 'judicial officer finds that there is probable cause to believe' that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: 'Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]'" United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(e)(3)). "A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985). "Section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the Government retains the 'burden of persuasion.'" Stone, 608 F.3d at 945.

"A defendant satisfies his burden of production when he 'com[es] forward with evidence that he does not pose a danger to the community or a risk of flight.'" Id. (quoting United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001)). "Although a defendant's burden of production 'is not heavy,' he must introduce at least some evidence." Id. "Even when a defendant satisfies his burden of production, however, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. "The presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." Id. "To rebut the presumption, therefore, a defendant should present all the special features of his case that take it outside the congressional paradigm." Id. at 946.

Here, the grand jury found probable cause and indicted Pruitt for three sex-trafficking charges (Counts 2, 9, and 10).  See Superseding Indictment.  Each of these is an offense under Chapter 77 of Title 18, United States Code, with a maximum term of imprisonment of 20 years or more, and triggers a rebuttable presumption in favor of detention pursuant to 18 U.S.C. § 3142(e)(3)(D).  The grand jury did the same for Pruitt's controlled-substance distribution crimes (Counts 12, 15, 17, and 18).  See Superseding Indictment.  Each of these has a maximum term of ten years or more; these counts carry their own separate presumption in favor of detention under 18 U.S.C. § 3142(e)(3)(A).

Applying the § 3142(g) factors below, the Court finds that Pruitt has failed to rebut the presumption of detention.  Indeed, Pruitt offers little argument regarding these factors, and instead primarily contends that his release is warranted in light of the COVID-19 pandemic.

### A.  Nature and Circumstances — 18 U.S.C. § 3142(g)(1)

Title 18 U.S.C. § 3142(g)(1) states:

> (g)  The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device.

The Government's proffer—based on several witness statements and the videos—and the grand jury's indictment implicate several of the express factors under 18 U.S.C. § 3142(g)(1).  These weigh heavily in favor of detention.

First, Counts 2, 9, and 10 all involve human trafficking in violation of Title 18 U.S.C. § 1591, which is an express factor in favor of detention under 18 U.S.C. § 3142(g)(1) ("whether the offense is . . . a violation of section 1591"). By definition, human trafficking is a violent, fraudulent, and coercive crime. See 18 U.S.C. § 1591(a) ("force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act[.]"). Here, the evidence demonstrates Pruitt's involvement in a conspiracy in which his co-Defendants employed beatings, various threats, degrading actions, and dangerous, addictive drugs to coerce the human trafficking victims into commercial sex acts. The orchestrator of the conspiracy, Bell, allegedly killed one female victim for failure to pay a drug debt, and police subsequently discovered that another victim is dead. Police bodycam video captured Pruitt brazenly discussing the fact that he could procure prostitutes for customers—as meanwhile a victim overdosed inside a room. And during the execution of the January 12, 2017 search warrant, agents rescued over a dozen lethargic and addicted female victims clustered in disheveled rooms.

Second, Counts 12, 15, 17, and 18 are controlled-substance offenses, which is another factor. See 18 U.S.C. § 3142(g)(1) ("whether the offense . . . involves a controlled substance"). The proffered evidence has shown the impressive scale of the conspiracy's drug distribution. Agents surveilled hundreds of drug transactions, and recovered extensive evidence of drug use and distribution during the search warrant. Again, video showed Pruitt speaking to police at the door of room 118 as a victim overdosed on drugs inside the room.

The Sixth Circuit "routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in

7

violence." Stone, 608 F.3d at 947 n.6. There is far more here than drug dealing, including strong evidence of violence, coercion, and several overdoses linked to Victory Inn drugs.[1]

Finally, Pruitt's human trafficking and drug offenses carry stiff penalties, including mandatory terms of 15 or 20 years, and up to life in prison. These penalties reflect the serious nature of these crimes. See, e.g., Baldwin v. New York, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty."). The nature of the instant offenses, therefore, weighs heavily in favor of Pruitt's detention.

### B. Weight of the Evidence — 18 U.S.C. § 3142(g)(2)

Title 18 U.S.C. § 3142(g)(2) instructs this Court to consider "the weight of the evidence against the person." The factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." Stone, 608 F.3d at 948; see also Hazime, 762 F.2d at 37 (weight-of-evidence factor "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community").

Here, the weight of the evidence of Pruitt's dangerousness and risk of non-appearance is strong. Witnesses described the threats, physical violence, and coercion employed by the co-

---

[1] Pruitt contends with respect to Counts 15 and 17 that the Government has not disclosed evidence of his direct involvement in the drug distribution chain, as required under United States v. Hamm, 952 F.3d 728, 738 (6th Cir. 2020), to be liable for the sentencing enhancement for controlled-substance distribution resulting in death or serious bodily injury. But Pruitt's presence at the door of the room where a human trafficking victim overdosed on drugs is certainly at least circumstantial evidence of his involvement in the distribution chain. Moreover, Pruitt's dangerousness is further evidenced by the serious nature of the sex trafficking offenses and his alleged involvement in the conspiracy.

8

conspirators to force the human trafficking victims into commercial sex acts. Extensive surveillance video documents hundreds of drug transactions, widespread prostitution, violence, and drug use, including an apparent overdose. Pruitt himself was captured on video openly discussing sex trafficking while a victim overdosed on drugs. Pruitt's dangerousness is further confirmed by his extensive criminal history and probation violation. Accordingly, this factor strongly favors detention.

### C. History and Characteristics — 18 U.S.C. § 3142(g)(3)

Under this factor, this Court must consider the following:

> [T]he history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3).

Pruitt has an extensive, decades-long criminal history, with four felony controlled-substance convictions, a felony-firearm conviction, and an armed-robbery conviction. Pruitt has twice pleaded guilty to violating probation, and he was on probation at the time he allegedly committed the charged offenses. Additionally, Pruitt has fourteen outstanding warrants, thirteen of which were issued as a result of his failures to appear. Given his past criminal conduct, poor record for appearing at court proceedings, and apparent disregard for the terms of his probation, Pruitt's history and characteristics weigh in favor of detention.

### D. Danger to Community — 18 U.S.C. § 3142(g)(4)

Under the pertinent part of 18 U.S.C. § 3142(g)(4), this Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

There is strong evidence that Pruitt would present a danger to the community and a risk of flight were he to be released. There is extensive evidence of Pruitt's involvement in a large-scale drug distribution conspiracy at the Victory Inn. "To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." Stone, 608 F.3d at 947 n.6; see also United States v. Leon, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'")). Further, the grand jury indicted Pruitt and found probable cause that he committed three separate human trafficking violations that required the use of "force, threats of force, fraud, [or] coercion" against his victims. 18 U.S.C. § 1591(a). As discussed above, Pruitt himself was captured on video openly discussing sex trafficking while a victim overdosed in a room. In view of this evidence, the Court is not persuaded that home confinement and electronic monitoring would adequately protect the public and ensure Pruitt's appearance were he to be released. As with the other § 3142(g) factors, this factor weighs in favor of Pruitt's detention.

### E. COVID-19

Pruitt contends that pretrial release is warranted in light of the health risks posed by continued incarceration during the COVID-19 pandemic. The Court is mindful of the exceptionally grave and unprecedented nature of COVID-19, which has continued to spread exponentially throughout the State of Michigan. And as acknowledged by the Centers for Disease Control and Prevention ("CDC"), incarcerated individuals face an even greater risk of

transmission, given the conditions frequently present in correctional and detention facilities. See United States v. Kennedy, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020). These conditions include, among other things, the highly congregational environment, the limited ability of incarcerated persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing), and potentially limited onsite healthcare services. Id.

While the generalized risks of COVID-19 cannot be disputed, courts evaluating whether pretrial release is necessary must evaluate the particularized risks posed to an individual defendant. United States v. Lee, No. 19-20112, 2020 WL 1540207, at *3 (E.D. Mich. Mar. 30, 2020). Some courts evaluating the impact of COVID-19 on the pretrial release calculus have considered the following four factors:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

United States v. Clark, No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). Although these factors have been applied in the context of motions for release under 18 U.S.C. § 3142(i), they are nevertheless relevant under the present procedural posture.[2]

First, as discussed above, the § 3142(g) factors overwhelmingly demonstrate that Pruitt presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety of the community and his appearance in court. This factor weighs decidedly in favor of Pruitt's continued detention.

---

[2] Subsection 3142(i) provides that a judicial officer may "permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

Second, Pruitt's health concerns are being addressed. Pruitt claims that, at nearly 56 years of age, he takes medication for atrial fibrillation and hypertension. Def. Notice of Joinder in Tawfik Mot. at 1. However, Pruitt has not provided any evidence demonstrating that he is receiving inadequate medical care. Indeed, Pruitt acknowledges that he is receiving medications to treat his conditions. See id. There is no reason to doubt that he will continue to receive such care. See United States v. Jones, No. 19-00249, 2020 WL 1511221, at *3 (W.D. Pa. Mar. 29, 2020) (denying motion for release under § 3142(i) because the defendant failed to demonstrate that his medical needs were not being addressed at the detention facility); see also United States v. Green, No. 19-85, 2020 WL 1493561, at *2 (W.D. Pa. Mar. 27, 2020) (same).

Nor has Pruitt demonstrated that he has been exposed to the virus as a result of his incarceration at the Huron County Jail ("Huron"). To the contrary, the Government responds that Lieutenant Josh Powell, who serves as the administrator of Huron, reports that no prisoners at the facility have been diagnosed with COVID-19 as of April 2, 2020. Gov't Resp. at 13 (Dkt. 437). Further, Huron has implemented a variety of precautions in an effort to reduce the risk of COVID-19 transmission within the prison. Huron, which is currently operating at 70% of its total housing capacity, is limiting its intake of new detainees to new arrests for violent crimes. Id. at 15. All new detainees are being medically screened for fever and other COVID-19 symptoms before entering the jail. Id. If a detainee's responses to screening questions raise concerns, or if a detainee exhibits any symptoms, that individual would be transported directly to a local hospital for medical clearance. Id. As a matter of course, new detainees are being isolated in quarantine for 72 hours to further screen for development of COVID-19 symptoms. Id. Any detainee exhibiting symptoms would be quarantined. Id. Should any detainees develop COVID-19, the record reflects that Huron has the capacity to address the illness, as it maintains contracts with a nurse and doctor.

Id. at 14.

Further, Huron has ceased all visitation from family members and attorneys. Id. at 15. Staff members are screened daily with a questionnaire and temperature check and have been directed not to enter the facility if they feel sick. Id. at 16. Detainees are provided with cleaning supplies daily, and jail personnel wipe down surfaces within the facility several times per day. Id. at 15. Huron has purchased ample sanitizing solution, and the entire facility is sprayed with the disinfectant "Virox" once a week. Id. Finally, all social programming for detainees has been suspended. Id. at 16. Such measures are consistent with those recommended by the CDC. See Kennedy, 2020 WL 1493481, at *2. This Court has not discovered any press coverage contradicting the Government's representations regarding the conditions and precautions being implemented at Huron.[3] This factor, therefore, also weighs in favor of continued detention.

Third, Pruitt has not explained how his release would minimize his risk of contracting COVID-19. Although Pruitt proposes home confinement with family and with electronic monitoring, he does not explain who else will reside at or frequent the home, or identify any COVID-19 precautions being implemented there. See United States v. Smoot, No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020). In contrast, the record demonstrates that access to Huron is limited and strictly enforced, thereby minimizing Pruitt's potential exposure to the virus. See id. This factor weighs in favor of Pruitt's continued detention.

Finally, Pruitt's release to home confinement would increase the risk of others contracting COVID-19. As other courts have recognized, "'[a] defendant who is unable to comply with

---

[3] Further, as of April 6, 2020, that State of Michigan has reported only four cases of COVID-19 within Huron County. See Confirmed Cases By County, available at https://www.michigan.gov/coronavirus/0,9753,7-406-98163-520743--,00.html (last visited Apr. 7, 2020).

13

conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.'" Id. (quoting Clark, 2020 WL 1446895, at *7); see also United States v. Aiad-Toss, No. 19-00521, 2020 WL 1514482, at *2 (N.D. Ohio Mar. 30, 2020) (noting that releasing a defendant to home detention and electronic monitoring unduly burdens pretrial services officers, who must perform installation and monitoring). Pruitt's history of probation violation and nonappearance renders these concerns all the more troubling. Additionally, Pruitt's release may increase the risk of infection to the family members with whom he would reside. See Dodd, 2020 WL 1547419, at *3. Consequently, this factor likewise favors Pruitt's continued detention.

In sum, these factors do not demonstrate that Pruitt's pretrial release is warranted in light of the risks presented by the COVID-19 pandemic. Accordingly, the Government has proved by clear and convincing evidence that Pruitt presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety of the community and his appearance in court.

### III. CONCLUSION

For the reasons discussed above, the Court finds that Pruitt must remain detained pending trial. Pruitt's requests for pretrial release (Dkts. 427, 431) are denied.

SO ORDERED.

Dated: April 8, 2020             s/Mark A. Goldsmith
     Detroit, Michigan           MARK A. GOLDSMITH
                                   United States District Judge